## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

11139 SOUTH MICHIGAN LLC,
Plaintiff

v.

THE FINISH LINE, INC., *et al.*,
Defendants

No. 24 CV 9659

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Defendants The Finish Line, Inc. ("Finish Line"), DTLR, Inc. ("DTLR"), and Genesis Holdings, Inc.'s ("Genesis") motion for summary judgment on Plaintiff 11139 South Michigan LLC's ("South Michigan") claim for breach of the parties' commercial lease agreement (the "Lease"). (R. 87.) Specifically, the defendants argue that they are entitled to summary judgment because South Michigan cannot prove that (1) it is entitled to a penalty fee of $1.3 million under the agreement, (2) the defendants did not timely pay rent or that recovery of unpaid rent is not barred by the statute of limitations, (3) South Michigan is entitled to rent payments following an agreement on the lease's expiration date, (4) South Michigan is entitled to roof-related damages or that recovery on those damages are not barred by the statutes of limitations and repose, and (5) Genesis Holdings and The Finish Line are liable for lease obligations incurred by Sneaker Villa (now DTLR). (*Id.*) For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[1] the materials cited therein, and other aspects of the record in this case.

### I. THE LEASE AND ITS RELEVANT PROVISIONS

Plaintiff South Michigan is a limited liability corporation that exists for the sole purpose of leasing commercial real estate located at 11139 South Michigan Avenue in Chicago. (Pl. Resp. to Def. SOF ¶ 2.)[2] Sneaker Villa, later acquired by Defendant DTLR, operated retail stores selling athletic shoes and apparel. (*Id.* ¶ 1, ¶ 1 n.1.) South Michigan and Sneaker Villa entered into the Lease in May 2012, to begin in October 2012, which allowed Sneaker Villa to operate a retail operation at 11139 South Michigan Avenue. (*Id.* ¶ 3.) The Lease specified a period of ten years, with the option to extend the term for an additional five years. (*Id.*) For the first five years of the lease, the monthly rent amount was $7,500. (*Id.* ¶ 4.) For years six through ten, the monthly rent increased to $8,333. (*Id.*) If the option to extend the Lease was exercised, the monthly rent would increase to $9,167. (*Id.*)

The Lease provided that Sneaker Villa "agrees to Pay rent . . . without demand, to Landlord . . . on the first day of each calendar month." (*Id.* ¶ 5.) In Section 9.2 of the Lease, it further provided that

---

[1] Defendant's Statement of Undisputed Material Facts ("Def. SOF") (R. 88); Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Pl. Resp. to Def. SOF") (R. 108); Plaintiff's Statement of Additional Facts Pursuant to Local Rule 56.1(B)(3)(c) ("Pl. SOF") (R. 107); Defendant's Response to Plaintiff's Statement of Additional Facts ("Def. Resp. to Pl. SOF") (R. 114.)

[2] For ECF filings, the Court cites to the page number(s) in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

> If any installment of Rent shall not be paid within 10 days after due, Tenant shall pay to Landlord a late fee equal to 5% of the late payment, to cover the additional administrative costs of Landlord. Any Rent or any expenditure made by Landlord . . . which shall not be paid within 10 days after due shall bear interest at the floating rate of 4% per annum in excess of the primate rate quoted from time to time in the Wall Street Journal.

(*Id.* ¶ 6.) The Lease gave Sneaker Villa an option to extend the Lease for an additional five years, exercisable by providing ninety-days' written notice to South Michigan. (*Id.* ¶¶ 7–8.) This would extend the Lease through October 2027. (*Id.* ¶ 7.)

## II.   LEASE MODIFICATIONS

The Lease was modifiable by written agreement between the parties, but Sneaker Villa could also rely on any notice given by the plaintiff unless otherwise notified by the plaintiff. (*Id.* ¶¶ 9–10.) Jim Farrey was principal, managing member, and agent for South Michigan. (*Id.* ¶ 11.) John Pawley and Lori Pawley were owners of South Michigan. (*Id.* ¶ 12.) Farrey, as South Michigan's agent, executed the Lease agreement on behalf of South Michigan, but was later replaced by John Pawley in 2020 and then Lori Pawley in mid-2024. (*Id.* ¶ 13.)

### A.   Modification of Rent Payment Dates

Though the Lease provided that it would commence no later than December 1, 2012, Sneaker Villa prepaid its first two months of rent at Lease execution pursuant to Section 4.1 of the Lease. (*Id.* ¶ 14.) Sneaker Villa did not commence operations in December 2012 because the space was not ready. The parties dispute why this was the case. The plaintiff argues that Sneaker Villa was completing its own preparations, while the defendants attribute the delay to the objection of a local

3

member of the Chamber of Commerce as to the property's use under the Chicago zoning ordinance. (*Id.* ¶ 16.) Farrey told Jared Sadlowski, Sneaker Villa's representative, that he had hired an attorney to begin the process of securing a zoning change for the space and thanked Sadlowski for his patience. (*Id.* ¶ 17.) Eventually, a building permit was issued in November 2013, and the Sneaker Villa store opened in December 2013. (*Id.* ¶ 18.)

Because Sneaker Villa's opening was delayed, Sadlowski asked Farrey if Sneaker Villa could defer rent payments until its store was open and operational; Farrey agreed, telling Sadlowski he was "happy to give him grace." (*Id.* ¶¶ 19–20.) Farrey also discussed the prospect of Sneaker Villa paying the deferred rent in a lump sum payment, but this was never memorialized in writing, nor was it further discussed or invoiced. (*Id.* ¶¶ 21–22.)

In March 2014, Crystal Ayler, Sneaker Villa's real estate administrator, confirmed a rent deferral and payment agreement by email to Farrey, asking him to "[l]et [her] know if any of [his] information differs from what is above." (*Id.* ¶ 23.) In his deposition, Farrey did not recall if that email comported with his understanding of the conversation with Sadlowski, nor did he recall any further communications with Ayler about any differences in the terms of the agreement. (*Id.* ¶¶ 24–25.) The parties again conferred about the deferral agreement in June 2014, though they dispute whether they confirmed the agreement at that time or whether Farrey responded; Farrey could not recall whether he let Sadlowski or Ayler know if the terms differed from his understanding. (*Id.* ¶¶ 26–28.) DTLR acquired Sneaker Villa

4

in August 2017. (*Id.* ¶ 29.) In March 2020, John Pawley, South Michigan's principal, wrote in an email to DTLR's representatives that South Michigan had agreed to a rent deferral agreement. (*Id.*) In general, however, the parties dispute whether this rent deferral arrangement was confirmed in practice.

### B. Modification of Lease Term Length

The parties dispute the start date of the Lease. DTLR contends that the Lease was for a ten-year term beginning on December 1, 2012. (*Id.* ¶ 30.) South Michigan, however, says that it began on October 29, 2012. (Def. Resp. to Pl. SOF 5.) In May 2021, Scott Collins, DTLR Chief Executive Officer, wrote in an email to Pawley and Farrey that he would not extend the Lease. (*Id.* ¶ 31.) Two days later, Collins provided a written and signed letter from DLTR stating that all Lease requirements had been satisfied and that there were no outstanding obligations between the parties except for rent payments through the conclusion of the Lease on August 31, 2024. (*Id.* ¶ 33.) Farrey did not recall ever disputing this expiration date. (*Id.* ¶ 34.) In 2024, Lori Pawley, co-owner and principal of South Michigan, wrote to DTLR stating that South Michigan did not have documentation referring to an exercise of the option to extend the Lease. (*Id.* ¶ 35.) However, she also stated that DTLR's non-vacancy of the premises constituted an exercise of the option. (*Id.*)

Neither DTLR nor Sneaker Villa ever sent formal notice that it was exercising its option to extend the Lease. (*Id.* ¶ 36.) In April 2024, DTLR vacated the South Michigan premises and turned over the keys that August. (*Id.* ¶ 37.) South Michigan indicated after the lawsuit's filing that it inferred that DTLR was exercising the lease

5

extension option because DTLR had made renovations to the store in light of civil unrest in mid-2020. (*Id.* ¶ 38.)

### III.   RENT PAYMENTS AND THIS LAWSUIT

Lori Pawley, co-principal of South Michigan and wife of John Pawley, began to manage South Michigan in 2024, though she had been involved with some management and was conversant in the business prior. (*Id.* ¶ 39.) When she took control, she began to investigate what she believed was owed to South Michigan. (*Id.*) Lori was not aware of the 2014 emails between Ayler and Farrey or the 2021 emails between John and Collins discussing the rent deferral agreement, and Farrey forwarded those emails to her in July 2024 (Ayler emails) and September 2024 (John Pawley emails). (*Id.* ¶ 40.) She was also not aware of the May 2021 letter from Collins advising that the Lease would terminate on August 31, 2024—this was forwarded to her in September 2024 as well. (*Id.* ¶ 41.) When she learned of the rent deferral, she scolded Farrey for not seeking payment in 2014. (*Id.* ¶ 42.)

In September 2024, South Michigan's counsel sent a letter to DTLR claiming that DTLR owed $1.9 million to South Michigan—$569,949.08 in unpaid past and future base rents and $1.3 million in late fee penalties and default interest. (*Id.* ¶ 43.) This was multiples higher than what South Michigan had communicated previously to DTLR regarding unpaid rents. (*Id.*) This amount also included real estate taxes that the City of Chicago back charged and future taxes. (*Id.*)

South Michigan filed its complaint on October 7, 2024, and attached the calculations that underpinned the $1.9 million claim. (*Id.* ¶ 44.) These calculations show every payment of monthly rent that Sneaker Villa or DTLR made to South

Michigan. (*Id.* ¶ 45.) DTLR made a payment of approximately $235,000 when it received the letter in September 2024 in an effort to settle the issue before the lawsuit. (*Id.*) Lori Pawley wrote in an email to DTLR that South Michigan would deduct amounts of unpaid rent from DTLR's balance with proof of payment over the first twenty-five months after December 2012. (*Id.* ¶ 46.) DTLR had paid two months of rent at the time of lease execution in May 2012 at a total of $15,000. (*Id.*) DTLR contends it made further payments, but South Michigan disputes that DTLR paid any of the additional rent balance sought. (*Id.*)

## IV.    ROOF CLAIMS

In July 2025, South Michigan amended its interrogatory answers asserting a new breach of contract claim over Section B(2) of Exhibit C to the Lease, which "required Tenant to install a new roof on the Premises before occupancy," which occurred in 2012; this allegation was not present in the complaint or the amended complaint. (*Id.* ¶¶ 47–48.)

In July 2014, Sneaker Villa provided a "closeout package" to South Michigan detailing the construction work and improvements Sneaker Villa performed in preparation for its retail operations. (*Id.* ¶ 49.) This package showed that Sneaker Villa had spent approximately $269,000 on various improvements, including money allocated for roof and deck repairs. (*Id.* ¶ 50.) South Michigan paid Sneaker Villa approximately $35,000 for this work as required. (*Id.*) South Michigan did not amend its complaint to include this alleged breach as part of its claim. (*Id.* ¶ 52.)

V.    GENESIS HOLDINGS AND THE FINISH LINE

Sneaker Villa was the entity that signed the Lease agreement with South Michigan in May 2012. (*Id.* ¶ 53.) DTLR acquired Sneaker Villa in August 2017. (*Id.* ¶ 54.) South Michigan, however, has also named Genesis Holdings and The Finish Line as defendants without providing any evidence to support their claim against either. (*Id.* ¶ 55.) In 2021, Genesis Holdings acquired DTLR, and DTLR remained separately structured as an LLC and conducted its own retail operations at the South Michigan location. (*Id.* ¶ 59.) The Finish Line is not a party to the Lease and has never assumed the obligations of Sneaker Villa under the Lease, nor has it made any payments to South Michigan. (*Id.* ¶¶ 60–61.)

## LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the Court draws all inferences in the light most favorable to the nonmoving party. *Id.* at 255. However, the nonmoving party cannot rely on mere conjecture or speculation to manufacture a genuine issue of material fact. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

ANALYSIS

### I.   LOCAL RULE COMPLIANCE

South Michigan spends considerable time in its response brief and response to DTLR's Local Rule 56.1 statement of facts noting non-compliance with rules regarding number of facts per line, use of footnotes for additional facts, and citations to specific evidentiary material. (R. 109 at 8–18.) The Court agrees that DTLR has attempted to include more than one fact, and in some cases far more than one fact, within a single numbered paragraph and admonishes DTLR for doing so. However, the Court will not strike any numbered facts because the number of facts asserted in total, in the Court's estimation, falls below the eighty-fact threshold set by the rule. Local Rule 56.1(d)(5).

### II.   LATE FEES

DTLR first argues that South Michigan is not entitled to its claim for $1.3 million in late fees because (1) South Michigan's interpretation of the provision governing late payments is incorrect as a matter of law, and (2) the provision creates an unenforceable penalty fee. (R. 87 at 9–15.)

#### A.   Interpretation

DTLR first argues that South Michigan's interpretation of the late payments provision is incorrect as a matter of law because the provision does not authorize compounding late payments. (R. 87 at 9–15.) The provision governing late fees is set out in Section 9.2 of the Lease titled "LATE PAYMENTS": "If any installment of Rent shall not be paid within 10 days after due, Tenant shall pay to Landlord a late fee equal to 5% of the late payment, to cover the additional administrative costs of

Landlord." (*Id.* at 10.) South Michigan seeks $1.3 million in fees arising from compounding, or cumulative, late payments—the result of interpreting "late payments" to be the total running overdue rent balance. (*See* R. 25-2 at 8.) DTLR says that the provision instead authorizes only simple payments, where "late payments" means the individual monthly late rent payment. (R. 87 at 11.)

Contracts are to be construed in accordance with their plain and ordinary meaning. *Am. Bankers Ins. Co. of Fla. v. Shockley*, 3 F.4th 322, 327 (7th Cir. 2021). "Whether a contract is ambiguous is a legal question for the courts." *Id.* (citing *Dash Messenger Serv., Inc. v. Hartford Ins. Co. of Ill.*, 582 N.E.2d 1257, 1260 (Ill. App. 1991)). The Court finds that DTLR's interpretation is correct. Most obviously, the terms or phrases "compound(-ing)," "cumulative," "*per annum*," or "running balance" do not appear in this provision governing late payments. Instead, the "late fee" appears to modify the "installment of Rent," meaning a monthly increment, not the entirety of the rent.

South Michigan makes two arguments in response. First, they say that a court could reasonably find that the provision allows for compounding late fees in light of Section 9.6. (R. 109 at 25–26.) This section, entitled "REMEDIES CUMULATIVE," provides that "No remedy of Landlord shall be considered to exclude or suspend any other remedy but all remedies shall be cumulative and shall be in addition to every other remedy in this Lease . . . ." (*Id.* at 25.) This provision does not mean what South Michigan wants it to mean. Nowhere does this provision allow for compounding fees for any individual remedy sought under the contract. Instead, the plain language

10

simply allows the Landlord to seek multiple remedies. For example, seeking a late fee would not prevent the Landlord from also terminating the lease.

Second, they argue that the intention and custom of the parties would have been to include compounding fees. (Id. at 26–27.) While it is true that a court must give effect to the intent of the drafting parties, this effect, however, is only given when a provision is ambiguous. *Harris Tr. & Sav. Bank v. LaSalle Nat. Bank*, 67 N.E.2d 408, 412 (Ill. App. 1990). The Court has found that the provision is itself unambiguous, so looking to custom or industry practice is inapposite. The Court accordingly grants summary judgment to DTLR on its interpretation of Section 9.2 as being non-compounding.

### B. Penalty Fees

In Illinois, penalty fee provisions are unenforceable. *Mufaddal Real Est. Fund, LLC v. Vara Sch. Prof'ls, Inc.*, 253 N.E.3d 390, 405 (Ill. App. 2024).

> An agreement setting damages in advance of a breach is an unenforceable penalty unless: (1) the amount so fixed is a reasonable forecast of just compensation of the harm that is caused by the breach; and (2) the harm caused is difficult or impossible to estimate. The unreasonable nature of the sum provided is sufficient grounds for finding that the sum was intended to be a penalty.

*Hidden Grove Condo. Ass'n v. Crooks*, 744 N.E.2d 305, 307 (Ill. App. 2001). And contrary to South Michigan's assertion that the enforceability of a provision is a factual issue, (R. 109 at 27), "[t]he construction and legal effect of a lease" and "the determination of whether a contract contains a valid damages provision, or an unenforceable penalty clause," is also a question of law. *Mufaddal Real Est., LLC,*

253 N.E.3d at 405 (citing *Crystal Lake Ltd. P'ship v. Baird & Warner Residential Sales, Inc.,* 138 N.E.3d 75, 89 (Ill. App. 2018)).

In *Mufaddal*, the Illinois Appellate Court considered a similar late payment provision that stated, "All payments of rent and additional rent not received within five (5) days of the due date shall be subject to a five percent (5%) late payment charge and such charge shall be collected as additional rent." *Id.* The court found that that provision constituted an unenforceable penalty because the late charge was unreasonable and was in place only to secure timely payment. Here, however, the provision states that late charges are meant to cover administrative costs, which Lori says included the time required to recover unpaid rents and the charges to mail notice to and contact a tenant. (R. 107-3 at 53:13–54:22.) Moreover, the Court finds that a one-time, non-compounded, five percent fee is reasonable given Illinois case law. *See, e.g., Mufaddal*, 253 N.E.3d at 406 (leaving five percent non-compounded late fee award intact); *see also, e.g., Andersonville S. Condo. Ass'n v. Fed. Nat'l Mortg. Co.*, 91 N.E.3d 404, 413 (Ill. App. 2017) ("Unlike the 28% late interest charged in *Hidden Grove*, in the present case, the monthly late fee was calculated at a 4% interest charge, a rate lower than the 5–10% interest rate the court in *Hidden Grove* found acceptable.").

## III.    RENT DEFERRAL AND THE STATUTE OF LIMITATIONS

DTLR next argues that the undisputed evidence shows that all rents were timely paid, and in the alternative, any claims for alleged unpaid rent before October 7, 2014, are barred by the applicable statute of limitations. (R. 87 at 16–23.) South

12

Michigan is claiming damages in part stemming from DTLR's alleged nonpayment of rents from 2012 to 2014. (*See generally* R. 25.)

### A.      Rent Claimed Prior to October 7, 2014

DTLR seeks summary judgment on contested rent payments prior to October 7, 2014, or ten years prior to the filing of this lawsuit. (*See* R. 1 (filed on October 7, 2024).) It argues that Illinois' ten-year statute of limitations on claims for breach of contract bars the claims here for rent from 2012 to October 2014. *See* 735 ILCS 5/13-206. It is undisputed that the parties agreed to a rent deferral for at least some of the period before October 2014 because the property was subject to a zoning dispute that did not allow DTLR to operate its store and, consequently, DTLR could not generate revenue. (Pl. Resp. to Def. SOF ¶¶ 17–19.) The parties also do not dispute that the rent deferral agreement was to be effective until DTLR's retail outlet was open and operational, which was in December 2013. (*Id.* ¶ 19.) Ayler's email to Farrey in March 2014 appears to confirm this agreement, and Farrey did not dispute the agreement as stated in her email at that point in time. (*See generally* R. 88-6.)

South Michigan attempts to argue that the statute of limitations began to run either in January 2015 or in July 2024. (R. 109 at 22–24.) The January 2015 argument is premised on the fact that DTLR began to pay rent in January 2015, so that was ostensibly the date that DTLR breached because it failed to pay the deferred rent back while beginning to pay normal rent. (*Id.* at 23.) In Illinois, "[a]n action for breach of contract accrues when the breach of the contractual duty or obligation occurs." *Newell v. Newell*, 942 N.E.2d 776, 780 (Ill. App. 2011). And "[w]here a money obligation is payable in installments, a separate cause of action accrues on, and the

13

statute of limitations begins to run against, each installment as it becomes due." *In re Marriage of Kramer*, 625 N.E.2d 808, 812 (Ill. App. 1993). DTLR's supposed breach occurred in December 2013, when it failed to pay the deferred rent, not January 2015, when DTLR fulfilled a different obligation in the Lease. There is no connection between DTLR failing to pay the deferred rent upon the store's opening in December 2013 and DTLR's first payment of rent in January 2015.

South Michigan's July 2024 argument does not fare much better. South Michigan claims that the contract language that defines a non-payment default only becomes effective ten days after South Michigan gives notice to DTLR of the non-payment. (R. 109 at 23–24.) According to South Michigan, because South Michigan notified DTLR by demand letter in July 2024 of the non-payment of the 2012-to-2014 rent, the statute of limitations started to run in July 2024. (*Id.*) This is illogical—South Michigan cannot indefinitely suspend the accrual date by electing not to send notice and so bypass the statute of limitations. The statute of limitations begins to run when "facts exist which authorize the bringing of an action." *Kozasa v. Guardian Elec. Mfg. Co.*, 425 N.E.2d 1137, 1141 (Ill. App. 1981). South Michigan did not suddenly become aware of DTLR's alleged breach in 2024. It was aware when DTLR allegedly did not pay at the end of the deferral period in December 2013. Because the Court finds that the breach occurred in December 2013, which triggered the statute of limitations, it grants summary judgment to DTLR on South Michigan's claim for rent until October 2014.

### B. Rent Claimed After October 7, 2014

However, South Michigan contends that DTLR also did not pay rent for the months of October, November, and December of 2014, claims that are not barred by the statute of limitations. The evidence on this issue conflicts. While DTLR contends that evidence of rent payments is included in emails between Ayler and Farrey, (R. 88-6,) South Michigan provides evidence that it has no record of receiving rent payments during those periods. (R. 107-1 ¶ 9.) Construing the facts in favor of South Michigan, a jury could find that DTLR did not pay their rent for those months to South Michigan. Accordingly, the Court denies summary judgment as to claims for rent for those three months.

### IV. COMMENCEMENT AND TERMINATION OF LEASE AND FUTURE RENTS

DTLR next argues that the undisputed evidence shows it is not liable for rent following August 31, 2024, because that was its termination date for the Lease. (R. 87 at 16–23.) In support of this argument, it points to an email from DTLR's Collins to South Michigan's Farrey and Pawley that states that the Lease would terminate on August 31, 2024—an email that Farrey and Pawley did not acknowledge or respond to. (*See generally* R 88-41.) South Michigan argues that this date has no basis in the Lease or in any prior agreement between the parties, and because it believes the Lease expired earlier and DTLR remained a tenant, that DTLR had either exercised its option to extend the Lease or was a holdover tenant under the terms of the Lease. (*See* R. 109 at 19–21.)

The Lease provided for a term length of ten years, with an option to extend an additional five years, to end no later than October 31, 2027. (R. 88-2 at 4.) The ten

15

years began at the "commencement date," which was defined as "the earlier of (a) 180 days after the execution of this Lease and delivery of the Premises to Tenant, (b) 120 days after Tenant opens for business in the Premises, or (c) December 1, 2012[.]" (*Id.* § 2.2.) The parties dispute both the commencement and the termination dates of the Lease. DTLR argues that a Lease commencement date of April 19, 2014, and a termination date of August 31, 2024, follows from its May 19, 2014, email, where Ayler emailed Farrey about paying rent from May 2014 onward after the store opened in December 2013 (recall that one definition of the term length in the Lease was 120 days after DTLR opened for business). (R. 88-6 at 2.) South Michigan argues that because the delivery occurred upon the signing of the Lease on May 2, 2012, the Lease commencement date would have been October 29, 2012 (180 days after May 2). (R. 109 at 29.)

The core of the commencement date issue appears to be the meaning of the language "delivery of the Premises to Tenant[.]" (R. 88-2 § 2.2.) The parties did not define "delivery of the Premises to Tenant" in the contract. DTLR argues that delivery of the premises actually occurred upon the opening of the store in December 2013 because the property was subject to zoning restrictions that made it impossible for it to operate prior. (R. 87 at 18.)

DTLR's interpretation of the term "delivery" stretches its meaning under the Lease. Nowhere does the Lease define delivery to mean that the property was zoned correctly or ready to be operated as a retail storefront. *See Slyce Coal Fired Pizza Co. v. Metro. Square Plaza, LLC*, 258 N.E.3d 199, 222 (Ill. App. 2025) ("In any event, as

16

Slyce acknowledges, the lease did not define the term 'delivery.' Certainly, the lease does not equate 'delivery' of the premises with it being ready to open for business."). DTLR also does not provide evidence linking the deferral agreement to any implicit or express agreement to modify the commencement date of the Lease away from December 1, 2012, within the meaning of Section 2.2. The Court accordingly does not accept that April 19, 2014, was the Lease's commencement date under Section 2.2's subsection (b).

That said, the record does not paint a clear picture of when the property was delivered, and Illinois law does not define "delivery of premises" as a term of art. It may line up with the date the Lease was signed or the date that DTLR actually possessed the property. The parties do not provide competent evidence to support either of these factual scenarios. The date of delivery determines whether the Lease commencement date is a date before December 1, 2012 (meaning subsection (a) would control), or after December 1, 2012 (meaning subsection (c) would control). In effect, the Lease commencement date is either December 1, 2012, or a date prior to December 1, 2012. This means that the termination date of the Lease, setting aside the five-year extension, is either December 1, 2022, or sometime between October 29, 2022, and November 30, 2022. The exact date cannot be pinpointed without more information regarding delivery. Because "delivery of the premises" is susceptible to more than one reasonable interpretation, the Court finds the term ambiguous as a matter of law.

17

Regardless of the Lease's commencement, DTLR's argument in favor of the August 31, 2024, Lease termination date does not have a basis in the Lease or in any communications between the parties. (R. 87 at 25.) Like the deferral agreement, the parties communicated about this possible termination date by email. Unlike the deferral agreement, however, the parties dispute whether the email effected the Lease termination. DTLR's argument boils down to acceptance by ratification; in DTLR's view, South Michigan's lack of response to Collins' email signals that the parties did not, in fact, dispute that August 31 was the termination date. (*Id.*) That view is extended by South Michigan continuing to collect rent at non-holdover rates. South Michigan, however, argues that silence does not indicate that the parties agreed on that date, which is correct. *See VLM Food Trading Intern., Inc. v. Illinois Trading Co.*, 811 F.3d 247, 252 (7th Cir. 2016). Instead, South Michigan argues that DTLR had (1) become a holdover tenant who was required to pay double rent or (2) exercised its option to extend the Lease by five years and so was liable for a higher rent rate. (R. 109 at 29–31.)

The aforementioned discussion and evidence establish that DTLR is liable, at minimum, for rent for the duration of its occupancy of the property, which ended in August 2024. South Michigan, however, seeks rent payments through October 31, 2027, the date that the parties agreed would be the absolute termination of the Lease had the option to extend been exercised. (R. 87 at 23–27.) DTLR argues that this is only possible if DTLR had agreed to exercise the option, which it argues the evidence does not show. (*Id.* at 27.) The Lease states that the option to extend would be

18

activated with notice from Tenant at least ninety days prior to the expiration of the original term. (R. 88-2 § 2.4.) The parties do not dispute that DTLR did not do so. South Michigan, however, argues that DTLR evinced an intent to extend the Lease by making repairs following civil unrest in mid-2020 after saying it would not do so, and this "expenditure somehow could be construed as an expression of DTLR's intent to exercise the option to extend." (R. 87 at 28.) No jury would find this sufficient under either the Lease or Illinois law to indicate an extension. *900 N. Rush LLC v. Intermix Holdco, Inc.*, 146 N.E.3d 52, 57 (Ill. App. 2019) ("Where a lease agreement requires written notice for the exercise of a renewal option, neither oral notice nor the lessor's actual knowledge of the lessee's intent is sufficient."); *see also La Salle Nat'l Bank v. Graham*, 456 N.E.2d 323, 324 (Ill. App. 1983); *Thomson Learning, Inc. v. Olympia Props., LLC*, 850 N.E.2d 314, 320–21 (Ill. App. 2006).

### V.     ROOF CLAIMS

DTLR next argues that it is entitled to summary judgment as to South Michigan's roof claim because it was not sufficiently pled and was instead brought up in a supplemental interrogatory response immediately prior to the close of fact discovery. (R. 87 at 30–33.) South Michigan counters, in essence, that its claim for breach was sufficient to put DTLR on notice of its roof claim. (R. 109 at 32.) That is a curious statement as South Michigan admits that its complaint and amended complaint "are silent on any allegations or claims relating to the roof on the building for the Leased Property." (R. 108 ¶ 47.)

South Michigan further admits that it did not reveal its roof-based breach claim until July 23, 2025, which was two days before the close of fact discovery. (*Id.*

19

¶ 39.) Months later, in January 2026, when responding to DLTR's motion for summary judgment, South Michigan attached a declaration for Lori Pawley that states, "Plaintiff was unaware of Tenant-Defendants' failure to replace the roof until receiving the letter from Scott Collins May of 2021." (R. 107-1 ¶ 16.) While the latter attempts to explain why South Michigan did not discover the alleged breach sooner, South Michigan makes no attempt to explain its delay in supplementing its discovery answers or amending its pleadings. Even if one were to credit Pawley's statement concerning when South Michigan learned of the roof breach, that was before it filed this lawsuit. That means it could have pled it, could have disclosed it in discovery, and certainly could have supplemented its discovery well before July 2025. It chose not to.

South Michigan's late disclosure harms DLTR. DLTR could not depose witnesses on the roof issue (why would it when it had an interrogatory response that identified all the ways DLTR allegedly breached the lease agreement). That allows South Michigan to create an issue of fact concerning when it learned of the roof issue with Lori Pawley's conclusory statement, despite strong evidence to the contrary. (*See* R. 108 ¶ 51 "Plaintiff also admits that Plaintiff paid Tenant-Defendants $35,000 on September 30, 2014 per the terms of the Lease that Landlord shall pay for new HVAC units and a new roof.") Because South Michigan offers no justification for its late disclosure of the roof claim and because that late disclosure was not harmless, South Michigan cannot pursue that claim. Accordingly, the motion for summary judgment is granted as to the claims for roof replacement.

## VI.   GENESIS HOLDINGS AND THE FINISH LINE

Finally, the defendants argue that summary judgment should be granted on all claims as to Defendants Genesis Holdings and The Finish Line. (R. 87 at 33–35.) It is undisputed that South Michigan has provided no evidence on whether or how Genesis Holdings or The Finish Line are liable for DTLR's rent payments. (*See* Pl. Resp. to Def. SOF ¶¶ 56–62.) Because there is no dispute of fact regarding their liability in this case, the Court grants summary judgment to Genesis Holdings and The Finish Line as to all claims.

## CONCLUSION

The defendants' motion for summary judgment is granted in part and denied in part. The parties shall confer and file a status report by June 22, 2026, indicating the anticipated length of trial and any trial conflicts in 2027. Additionally, the Court issues a rule to show cause concerning DTLR's citation and quotation of the cases in footnote 3.[3] The Court did not find the quoted language or propositions attributed to those cases in the respective opinions. Rule to show cause hearing set for June 18, 2026, at 9:30 a.m. To the extent DLTR intends to file a written response to the rule to show cause, that response is due on or before June 11, 2026.

 Date: June 1, 2026

_____
JEREMY C. DANIEL
United States District Judge

---

[3] *In re Marriage of Saputo*, 845 N.E.2d 901 (Ill. App. 2006); *United States v. All Meat & Poultry Prods. Stored at Lagrou Cold Storage*, 470 F. Supp. 2d 823, 830 (N.D. Ill. 2007); *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 (7th Cir. 2015); *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011); and *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)